# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Vascular Solutions, Inc.,                                                        Civil No. 09-2089 (DWF/JJG)

              Plaintiff,

v.                                                                        **MEMORANDUM**
                                                                              **OPINION AND ORDER**

Edward Pedregon,

              Defendant.

---

David Y. Trevor, Esq., J. Thomas Vitt, Esq., and Jana E. Bruder, Esq., Dorsey & Whitney LLP, counsel for Plaintiff.

Bradley J. Lindeman, Esq., John J. McDonald, Jr., Esq., and Livia E. Babcock, Esq., Meagher & Geer, PLLP, counsel for Defendant.

---

## INTRODUCTION

This matter came before the Court on August 20, 2009, pursuant to a Motion for Temporary Injunction brought by Plaintiff Vascular Solutions, Inc. ("VSI").[1] In its Complaint, Plaintiff asserts the following causes of action: (1) breach of contract; (2) misappropriation of trade secrets in violation of the Minnesota Uniform Trade Secrets Act; (3) tortious interference with business relations; and (4) breach of fiduciary duty. For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

---

[1] VSI initially brought the Motion for Temporary Injunction in Hennepin County District Court, and the action was removed to this Court on August 10, 2009, before the Motion for Temporary Injunction was heard. Because Defendant has had the opportunity to respond to the motion, the Court will treat this as a Motion for Preliminary Injunction.

**BACKGROUND**

This motion for a temporary restraining order arises out of a dispute between VSI and its former employee, Defendant Edward Pedregon, regarding Pedregon's employment by Spectranetics, an allegedly direct competitor of VSI, and Pedregon's purported retention and use of VSI's confidential and proprietary information after Pedregon left his employment with VSI.

VSI is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. The company develops medical devices in the vascular medicine field and has a number of different product lines including hemostasis products, extraction catheters, specialty catheters, access products, and vein products. (Christian Aff. ¶¶ 3, 4.) VSI develops and markets its products domestically and distributes them internationally. (*Id*. ¶ 3.) The company sells its products directly to interventional cardiologists and interventional radiologists through various regions of the United States. (*Id*. ¶¶ 3, 5.)

Pedregon began working as an Associate Account Manager at VSI in May 2007. In this role, Pedregon was responsible for selling VSI's medical device products at hospitals and clinics in VSI's El Paso, Texas, territory. (Christian Aff. ¶ 19.) Pedregon also had some responsibilities for customer accounts in New Mexico. (*Id*.) Pedregon's Employment Agreement, signed on April 21, 2007, contained a one-year non-competition agreement and a provision by which Pedregon agreed not to use or disclose VSI's confidential information and to return such information to VSI at the end of his employment. (Christian Aff. ¶ 17, Ex. 5 ¶¶ 6-7.)

As part of his employment, Pedregon also agreed to the VSI Code of Business Conduct and Ethics, which he acknowledged on January 14, 2009. (Christian Aff. ¶ 14 and Ex. 4.) The Code of Business Conduct stated:

> Except as required in his/her duties to the Company, the Employee will not, during his/her employment or for a period of three (3) years after termination of his/her employment with the Company, use or disclose Confidential Information to any person not authorized by the Company to receive it. . . .

(Christian Aff. ¶ 14 Ex. 3 ¶ 6.) The Code of Business Conduct further stated that

> When the Employee's employment with the Company ends, he/she will promptly turn over to the Company all records and any compositions, articles, devices, apparatus, and other items that disclose, describe, or embody Confidential Information, including all copies, reproductions, and specimens of Confidential Information in his/her possession, regardless of who prepared them.

(*Id.*) In addition, the Code of Business Conduct stated:

> The Employee agrees that during his/her employment with the Company and for a period of one (1) year after his/her employment with the Company ends:
>
> (a) He/she will not alone, or in any capacity with another firm:
>
> (i) directly or indirectly engage in the manufacture or distribution of products directly competitive with the Company's, nor will he/she participate in the management or operation of, or become a significant investor in, any venture or enterprise of whatever kind as a principal, officer, director, employee, representative, agent or shareholder or any entity whose business is directly competitive with the Company's provided that, nothing in this [section] shall prohibit the employee's employment by or association with any entity, venture, or enterprise which engages in a business with a product or service competitive with any product or service of the Company so long as the following conditions are complied with: (a) the Employee's employment or association with such entity, venture or enterprise is limited to work which does not involve or relate to the design, development, production, marketing or servicing of a product or service which is directly competitive with any product or service of the Company

3

and (b) the Employee's employer takes reasonable measures to insure that the Employee is not involved with or consulted in any aspect of the design, development, production, marketing, or servicing of such competitive product or service.

(ii) solicit for competitive business or in any way intentionally interfere or attempt to interfere with the Company's relationships with any of its current or potential customers;

. . .

(b) Employee will, prior to accepting employment with any new employer, inform that employer of this Agreement and provide that employer with a copy of Section 7 of this Agreement, provided that he/she reasonably believed his/her new position is or may be contrary to this Agreement.

(*Id.* ¶ 7.)

VSI asserts that it invests substantially in its sales force's training and retention. (Christian Aff. ¶ 6.) Further, VSI contends that its sales representatives are given highly confidential, proprietary, and trade secret information regarding VSI's product specifications, as well as details on the market positioning of VSI's products relative to its competitors. (*Id.* ¶ 6.) At its twice-yearly National Sales Meetings, VSI gives sales representatives a training notebook that includes information on its products, including any new products yet to be introduced to market. (*Id.* ¶ 7.) VSI asserts that such information is extremely sensitive, highly confidential, and constitutes trade secrets. (*Id.*)

In his capacity as sales representative for VSI, Pedregon attended one of VSI's National Sales Meetings from January 13-16, 2009, in Tempe, Arizona. (*Id.* ¶ 8.) At that meeting, VSI unveiled a new product, the Minnie Support Catheter. VSI contends that the Minnie Support Catheter competes with other support catheters in the market, including the Quick-Cross Support Catheter sold by Spectranetics. (*Id.*) The sales

meeting notebook provided to Pedregon and other sales representatives included highly confidential and trade secret information regarding the Minnie and its competitive position in the market relative to the Quick-Cross. (Christian Aff. ¶ 9, Ex. 1.) Specifically, the Notebook included PowerPoint slides with information regarding VSI's strategy for positioning and selling the Minnie relative to the Quick-Cross. (*Id*.)

VSI has a program called the "Partner Program" for certain sales representatives who have been at the company longer than six months. Through the Partner Program, partners receive additional compensation and become eligible for other benefits and bonuses. (*Id*. ¶ 25, Ex. 7.) In March 2008, Pedregon was offered a Partner position at VSI and signed the Field Partner Employment Agreement (the "Partner Agreement") with an effective date of April 1, 2008. (Christian Aff. ¶ 24, Ex. 7.) In the Partner Agreement, Pedregon agreed that he would not "during [his] employment or after termination of [his] employment with the Company, use or disclose Confidential Information to any person not authorized by the Company to receive it . . . ." (Christian Aff. ¶ 27, Ex. 7 ¶ 6(b).) Pedregon also agreed to a one-year non-compete provision. (*Id*. ¶ 7(a).) Specifically, he agreed not to work for any "Conflicting Organization," including "any person, corporation, or entity that engages in business related to Interventional Cardiology, Interventional Radiology or Electrophysiology, including any entity that sells any product to health care providers in any of these three medical practice areas. . . ." (*Id*.) Further, Pedregon agreed that

> During the term of employment with the Company, and for a period of twelve (12) months after the termination of such employment, for any reason, Employee shall not, directly or indirectly, divert, solicit or accept

5

> business from any client or prospective client of the Company who was solicited or serviced directly by Employee, or where Employee supervised, directly or indirectly, in whole or in part, the solicitation of, or service activities related to, such clients or prospects, or where Employee obtained confidential information pertaining to the client or prospect.  Employee shall not, directly or indirectly, in any way interfere or attempt to interfere with the Company's relationships with any of its actual or potential suppliers or vendors.

(Christian Aff. Ex. 7, ¶ 7(b).)

Pedregon was promoted to Account Manager within the Partner Program in July 2008. (Christian Aff. ¶ 26.)  Then, on March 26, 2009, Pedregon told VSI that he was withdrawing from the Partner Program. (*Id*. ¶ 29.)  At that time, VSI notified Pedregon that the effective date of his termination from the Partner Program was July 1, 2009. (*Id*.)

On May 6, 2009, Pedregon e-mailed his Regional Manager and VSI's Senior Director of Sales, informing them of his resignation and giving his two-week notice. (*Id*. ¶ 30.)  On May 15, 2009, a VSI Human Resources representative sent a letter to Pedregon, confirming his resignation and asking that he return any Company property. (*Id*. ¶ 31, Ex. 9.)  That same day, VSI's CEO sent Pedregon a letter reminding him of his non-disclosure, non-compete, and non-solicitation obligations. (*Id*. ¶ 32, Ex. 10.)

Sometime around Pedregon's last day of employment, Pedregon referred to VSI the name of a potential candidate for his replacement. (*Id*. ¶ 33.)  Pedregon also told VSI that he was going to work for a urology company. (*Id*.)

In June 2009, VSI learned that Pedregon had started working for Spectranetics, a medical device company that VSI asserts is a direct competitor of VSI's in the interventional cardiology and interventional radiology medical device fields. (*Id*. ¶ 34.)

6

VSI also discovered that Pedregon was working as the field representative for Spectranetics' Quick-Cross catheter in the El Paso, Texas, territory. (*Id.*)

On June 8, 2009, VSI's CEO sent Pedregon a letter notifying Pedregon VSI was aware of Pedregon's employment with Spectranetics and reiterating Pedregon's non-disclosure, non-compete, and non-solicitation obligations. (*Id.* ¶ 36, Ex. 11.) A day after Pedregon received this letter, Pedregon sent a text message to his former Regional Manager that stated, "Dude dnt [sic] hire a rep in el paso its done out here." (*Id.* ¶ 37, Ex. 12.) VSI also asserts that when the company interviewed the candidate who had been referred by Pedregon to replace him, the candidate indicated that Pedregon had told her that she should not sell the Minnie in El Paso. (*Id.* ¶ 38.) Pedregon denies this assertion. (Pedregon Decl. ¶ 11.)

VSI asserts that it received Pedregon's laptop and Blackberry on June 22, 2009, over a month after he left his employment. (Christian Aff. ¶ 38.) VSI contends that at the time the motion was filed, Pedregon had not yet returned other confidential or proprietary information, including training materials, product samples, product or sales notebooks, PowerPoint and the like. (*Id.* ¶ 39.)

VSI's General Counsel sent Pedregon another letter notifying Pedregon that it had not received all of the confidential information in his possession and demanding that Pedregon return it. (*Id.* ¶ 40.)

In response to VSI's motion, Pedregon asserts that he received less than one hour of training related to the Minnie Support Catheter while at VSI. (Pedregon Decl. ¶ 5.) Pedregon acknowledges that he was responsible for selling the Minnie Support Catheter

7

for approximately three months prior to his resignation from VSI, but states that the Minnie comprised approximately less than 8% of his gross sales. (*Id*. ¶¶ 6-7.)

Pedregon contends that the information that was supplied to him while an employee at VSI was stored in the garage at his former residence. (*Id*. ¶ 13.) However, Pedregon asserts that he is presently engaged in proceedings to dissolve his marriage and that, from approximately May 10, 2009, through August 14, 2009, he was locked out of his home and garage. (*Id*. ¶¶ 14-15.) Pedregon states that once he was given access to his home and garage on August 14, 2009, he learned that a majority of his personal belongings had been discarded or destroyed. (*Id*. ¶ 15.) Pedregon asserts that he has transmitted all materials that VSI claims to be the property of VSI to the company and that he has no additional information in his possession that is claimed to be the property of VSI. (*Id*. ¶¶ 16, 22-23.)

Pedregon contends that all of the work that he performs at Spectranetics is focused on a specific medical procedure—coronary and peripheral atherectomy.[2] (*Id*. ¶ 19.) Pedregon asserts that he has received substantial training on this procedure since he began working for Spectranetics and that he did not have similar training while at VSI. (*Id*. ¶ 21.) Pedregon contends that he does not use any materials or customer lists from VSI to perform his current job duties. (Id. ¶¶ 22-23.) Pedregon asserts that the current product line that he supports includes about five products, including the Quick-Cross

---

[2] Pedregon's Declaration asserts that the procedure is a "corticotomy" but, at oral argument on this matter, Pedregon's counsel asserted that the proper procedure is an "atherectomy."

Support Catheter. (*Id.* ¶ 25.) Pedregon states that no other products in his "catalog" directly compete with VSI's offerings. (*Id.* ¶ 27.)

## DISCUSSION

Under Eighth Circuit precedent, a preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). None of the factors by itself is determinative; rather, in each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Publ'g. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### A. Likelihood of Success on the Merits

The first Dataphase factor requires that the movant establish a substantial probability of success on the merits of its claim. *See Dataphase*, 640 F.2d at 114. In its motion, VSI asserts that it is likely to succeed on the merits of its claim that Pedregon violated the Partner Agreement. The Court agrees.

First, Pedregon was clearly obligated to return all confidential information in his possession to VSI. (Christian Aff. Ex. 7, ¶ 6(b).) It is undisputed that Pedregon did not turn over all confidential and proprietary information to VSI at the time of his departure

from the company.  Whether Pedregon's violation continues to date appears to be a disputed fact.

Second, VSI is likely to succeed on its claim that Pedregon violated the Partner Agreement's clause requiring that he does not disclose confidential information.  (*Id*. Ex. 7, ¶ 6(b).)  Such a violation can be inferred from the fact that Pedregon went to work for Spectranetics just after receiving confidential information about the Minnie Support Catheter and, specifically, he began selling a product that is in direct competition with the Minnie Support Catheter.

Finally, VSI has demonstrated a probability of success on the merits of its claim that Pedregon has breached the non-competition and non-solicitation clauses of his Partner Agreement.  (*Id*. Ex. 7, ¶¶ 7(a)-(b).)  Pedregon is performing the same job for Spectranetics in the same territory as he worked for VSI.  By selling a competing product in that same territory, he is competing directly with his former employer.  Moreover, Pedregon was careful in his affidavit not to directly address whether he was soliciting former customers.  The Court expects that if Pedregon was not soliciting former customers, he would have made that clear in the affidavit.  Consequently, the only reasonable inference to draw is that Pedregon was, in fact, soliciting former customers.

**B.     Irreparable Harm and Balance of Harms**

VSI must establish that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages.  *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir.1986).  Here, VSI contends that it will suffer irreparable harm because Pedregon has VSI's confidential information, including

materials comparing the VSI's support catheter to Spectranetics' Quick-Cross. Second, VSI asserts irreparable harm in that Pedregon will utilize his knowledge of VSI's customers and products in his employment with Spectranetics. Third, VSI contends that by performing the same job for Spectranetics in the same territory as he worked for VSI, Pedregon will inevitably disclose VSI's confidential information. On these bases and others, VSI asserts that it needs to protect its goodwill with its current customers, its client relationships, and the confidential information about its products. These all constitute irreparable harm in that they are not readily compensable monetarily.

The balance of harms weigh in VSI's favor. Although the potential harm to Pedregon is significant, Pedregon can work outside of the prohibited non-competition geographical area, on products that do not directly compete with VSI. The damage to VSI's goodwill and customer relationships, however, is irreparable.

**C.    Public Interest**

The public interest favors VSI's request for injunctive relief. The public interest is served by enforcing contracts and maintaining fair competition.

Accordingly, and consistent with the Court's remarks off the bench, **IT IS HEREBY ORDERED** that:

1. Vascular Solutions, Inc.'s Motion for Temporary Injunction (Doc. No. 12) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    a. Defendant Pedregon is hereby enjoined from violating his Partner Agreement in which he knowingly agreed not to compete against VSI for twelve months following the date of entry of this Order;

b. Defendant Pedregon is hereby enjoined from directly or indirectly rendering services to the Spectranetics Corporation, or any other "Conflicting Organization," or engaging in competition with VSI, in any manner or capacity, in the West Texas or New Mexico territories in which he worked at VSI for sixty days following the date of this Order, absent agreement of the parties or further Order of this Court;

c. Defendant Pedregon is hereby enjoined from directly or indirectly rendering services to any Conflicting Organization, or engaging in competition with VSI, in any manner or capacity, or directing any other individual or business enterprise to engage in competition with VSI in any manner or capacity, on any Competitive Products, as defined and prohibited by the Partner Agreement, for twelve months following the date of entry of this Order;

d. Defendant Pedregon is hereby enjoined from soliciting or accepting business from any VSI customers or prospective customers who Pedregon solicited or serviced directly, or where Pedregon supervised, directly or indirectly, in whole or in part, the solicitation of, or service activities related to, such clients or prospects, or where Pedregon obtained confidential information pertaining to the client or prospect, as prohibited by the Partner Agreement, for a period of twelve months following the date of entry of this Order;

  e. Defendant Pedregon is hereby enjoined from violating his Partner Agreement obligating him not to retain, disclose, and/or use VSI's confidential and proprietary information and trade secrets; and

  f. Defendant Pedregon is hereby ordered within three days of the date of this Order to return all of VSI's confidential and proprietary information and trade secrets in his possession, including, but not limited to: all materials from the National Sales Meeting in July 2007, the World Sales Meeting in July 2008, and the National Sales Meeting in January 2009; any and all of VSI product notebooks; and sterile samples including 7 Micro-Introducer Kits, 1 Standard Vari-Lase Procedure Pack, 2 SkywayRX and 1 Minnie Support Catheter.

2. VSI is directed to post a $25,000 bond or $25,000 cash with the Clerk of Court's Office as security pursuant to Fed. R. Civ. P. 65(c).

3. The parties are directed to contact Magistrate Judge Jeanne J. Graham's calendar clerk, Judith Kirby, at 651/848-1890, to set up scheduling and discovery conferences with the Magistrate Judge.

4. Absent stipulation, the parties will appear before this Court on November 6, 2009, at 9:30 a.m., to update the Court on the status of the matter and resolve any remaining concerns about the preliminary injunction. The purpose of this status hearing is to review compliance issues and the scope of the preliminary injunction.

Dated: August 26, 2009     s/Donovan W. Frank
                DONOVAN W. FRANK
                United States District Judge